**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **THE MITCHELL CO., INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO 07-0177-KD-C** |
| | ) | |
| **JOSEPH J. CAMPUS III, and** | ) | |
| **JAMES Y. YOUNG,** | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on Plaintiff The Mitchell Co., Inc.'s Motion for Partial

Summary Judgment (Docs. 235-238), Defendant James A. Young's Motion for Summary Judgment

(Docs. 239-241), Defendant Joseph J. Campus, III's Motion for Partial Summary Judgment (Docs.

242-245) and the responses and replies thereto (Docs. 248-250, 252-254, 263-266, 271-273); and

Defendant Young's objection (Doc. 287) and motion to strike (Doc. 276).[1]

**I.     Background**

**A.     Procedural**

Plaintiff The Mitchell Company, Inc. ("TMC") initiated this action on March 7, 2007,

---

[1] On October 7, 2009, Defendant Young filed an objection to the testimony of Edsel Matthews, Esq. (Doc. 287). Young styles the pleading as a motion objecting to Matthews testimony as an expert; however, Matthews was a former defendant, and has not been named as an expert witness in this case. Additionally, any challenges to experts were due to be filed by October 1, 2009 (Doc. 211 at 2) to comply with the Rule 16(b) Scheduling Order (as amended). Additionally, Young filed a motion to strike the affidavit of Lindsay Boney (Doc. 276) based on the sham affidavit doctrine (citing Boney's statements that as part of his job, he reviewed HUD-1 Settlement statements to look for commissions and fees paid at closing if any (Doc. 238-5)) – versus his deposition testimony in another case, CV 08-623, in which he testified "that was not my job," it was not anyone's job in his department, and that Joe Campus or the city manager "were responsible for deciding that the HUD-1 was correct[]").  (Doc. 276-2 at 3).  The statement in Boney's affidavit appears to be a direct contradiction, without explanation, to his prior sworn deposition testimony.  TMC did not file any response to this motion.  As such, that portion of Boney's affidavit, but not the entirety of same, is **STRICKEN** such that Young's motion is granted in part (denied to the extent Young seeks to strike the entire affidavit).

alleging various claims against Defendant Joseph J. Campus, III ("Campus") relating to a series of real estate transactions in which TMC alleges that Campus conspired with others to fraudulently flip real estate and sell it to TMC for a substantial profit.  (Doc. 1).  Campus filed an answer to the complaint, along with a counterclaim against TMC, on April 9, 2007.  (Doc. 4).  TMC filed a first amended complaint adding as defendants, James Young ("Young") and Edsel Matthews ("Matthews").  (Doc. 29).  The amended complaint alleges, in relevant part, that Campus obtained unlawful profits by having limited liability companies that Campus and/or Young owned and controlled, acquire real estate that Campus then recommended to TMC, that the LLCs then sold to TMC, at a significantly higher price than that which Campus and Young's LLCs purchased it.  (Id.)  TMC alleges that Young participated in this scheme and profited from it.  (Id.)

On September 18, 2007, Campus, Young and Matthews filed separate motions to dismiss the amended complaint.  (Docs. 45, 46, 48, 49, 50).  The Court granted the motion to dismiss the claims of conversion and unjust enrichment but otherwise denied Campus and Young's respective motions to dismiss.  (Doc. 75).

On January 28, 2008, TMC filed a Second Amended Complaint alleging that the "Defendants are persons who through unlawful and wrongful acts have profited from or are profiting from business activities in which they, in general, had a conflict of interest, misrepresented and/or suppressed information, failed to act in the best interest" of TMC, "violated their duties of due care, loyalty and good faith or otherwise conspired with each other to cause injury" to TMC "for their own profit and gain."  (Doc. 79 at 1).  The second amended complaint alleges: Count One-intentional, willful and reckless fraud; Count Two-negligent or mistaken fraud; Count Three-suppression; Count Four-breach of fiduciary duty; Count Five-negligence; Count Six-wantonness;

2

Count Seven-common law civil conspiracy; Count Eight-conversion; Count Nine-officer and director's liability; Count Ten- professional negligence of counsel; Count Eleven-violation of Alabama Trade Secrets Act; Count Twelve-disgorgement; and Count Thirteen-unjust enrichment. (Id.)

On February 11, 2008, Young filed a motion to dismiss. (Doc. 84, 85). The Court reiterated the dismissal of the claims for conversion and unjust enrichment but otherwise denied Young's motion to dismiss. (Doc. 165). On December 22, 2008, Mathews filed a motion to dismiss which was granted. (Doc. 192). TMC recently dismissed its claim for misappropriation (Count Eleven). (Docs. 259, 267).

**B.    Facts**[2]

###    1.    Relevant People & Entities

Plaintiff, The Mitchell Company, Inc. ("TMC"), is an Alabama corporation with its principal place of business in Mobile, Alabama, engaged in the development of single-family home projects, apartments, condominiums, office buildings and shopping centers in Alabama, Florida and Mississippi. (Doc. 29 at ¶16; Doc. 238-2 (Dep. C.Stefan at 11); Doc. 238-3). TMC Board Members included President and CEO John B. Saint ("Saint"), Don Kelly ("Kelly"), Chester J. Stefan ("Stefan") and CFO Lindsay C. Boney, III ("Boney"). (Doc. 238-4 (Dep. J.Campus at 143)). TMC is owned by JDC Corporation, which is owned by TMC officers and board members Saint, Kelley and Stefan. (Doc. 245-9 (Dep. J.Saint at 15-16)). Saint, Stefan, and Kelly have ownership interests

_____

[2] The Court is mindful that "'[w]hen both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.'" Muzzy Products, Corp. v. Sullivan Indus., Inc., 194 F. Supp. 2d 1360, 1378 (N.D. Ga. 2002) (quoting Gart v. Logitech, Inc., 254 F.3d 1334, 1338-1339 (Fed. Cir. 2001)). The Court has reviewed the facts submitted by each party and has made its own examination of the evidentiary record in determining the relevant undisputed and disputed facts.

in other related and/or affiliated companies involved in various aspects of the real estate development business and some of which were established to do business with TMC or provide TMC board members and/or owners with investment opportunities.[3]  (Id. at 19, 25-36, 41, 212-213).

Defendant Joseph J. Campus, III ("Campus") was an officer and a board member of TMC, Executive Vice-President and Head of the Single-Family Division at TMC, and is a citizen of the State of Florida.  (Doc. 1 at 2; Doc. 238-4 (Dep. J.Campus at 142, 144; Doc. 254-2 (Aff. Campus at ¶2)).  He was employed by TMC from 1990 through March 7, 2007.  (Doc. 254-2 (Aff. Campus at ¶2)).  As part of his job, he did not have authority to make decisions to purchase property for TMC without the approval of the TMC board or management.  (Doc. 238-4 (Dep. J. Campus at 142-143)).  Part of his compensation from TMC came in the form of a bonus.  (Doc. 245-9 (Dep. J.Saint at 45)).

Defendant James A. Young ("Young") is a citizen and resident of Florida.  (Doc. 1 at ¶19; Doc. 73 at ¶9).  Young was in the real estate business as an investor; he provided the financing for the projects that Campus was involved with in this case.  (Id.) See also Doc. 238-8 (Dep. J.Young at 30-34, 45); Doc. 238-9).  Campus has known Young since the late 1980s: "[w]e're friends and we've been involved in real estate transactions together[]" as business partners.  (Doc. 238-4 (Dep. J.Campus at 68-69)).

Paul Saba ("Saba") was the Pensacola, Florida City Manager for TMC for single-family homes and the Senior Vice-President of TMC from 2004-2008.  (Doc. 238-2 (Dep. C.Stefan at 39); Doc. 238-10 (Dep. D.Kelly at 16); Doc. 254-3 (Aff. Saba)).  Lindsey C. Boney, III ("Boney") is the

---

[3]  There is no information in the record as to whether the officers disclosed these opportunities or their involvement with same in their dealings with TMC.

Chief Financial Officer (since August 2001) of TMC.  (Doc. 238-5; Doc. 273-2 (Dep. Boney at 4)).

Edsel F. Matthews, Esq., ("Matthews") a dismissed party-defendant, is an attorney licensed to

practice law in the State of Florida; he represented TMC in closings on the property transactions at

issue in this case.  (Doc. 238-17).

The limited liability companies involving Campus and/or Young and which were part of the

property transactions at issue are: Bagdad 80, LLC (with Campus and Young as members); Three

Seas, LLC (Campus and one of his sons as members); JAY Consulting, LLC (with Young as a

member); Stapleton 70, LLC (with Young as a member); Pond Creek 50, LLC (of which Three Seas,

LLC is a 33.3% member with Young, Harry Bell and Allan Bell as members); and Loxley 16, LLC

(with Young as a member). (Doc. 238-4 (Dep. J.Campus at 263-264, 351); Doc. 238-8 (Dep.

J.Young at 79); Doc. 238-15; Doc. 238-19; Doc. 238-22; Doc. 245-19 at 15-21; Doc. 245-20; Doc.

245-21 at 8-9; Doc. 245-22 at 5; Doc. 249-15 (Aff. J.Young at ¶¶2, 5)).

## 2.    **Relevant Real Property Transactions**

This lawsuit arises out of real estate transactions in which TMC alleges that Young and

Campus conspired to fraudulently flip real estate to TMC at a substantial profit.  The record reveals

that in 2005, Campus received $257,605.35 from JAY Consulting, LLC, and that in 2006, Three

Seas, LLC received $293,636.42 from JAY Consulting, LLC. (Doc. 238-26; Doc. 238-27).  Campus

testified that he received approximately $1,600,000 as a result of these transactions.  (Doc. 238-4

(Dep. J.Campus at 470-471)).  TMC claims damages totaling $26,780,822 based upon $13,390,411

in "lost opportunity costs," $11,649,745 in "total property damage," and $1,740,666 in "due

diligence" damages.  (Doc. 245-18 at 6).

### a.    **TMC's Decision Making Process**

The process for deciding whether TMC would purchase a property in the single-family division included gathering information from the city managers and viewing the property. (Doc. 238-10 (Dep. D.Kelly at 11-12)). TMC board members tried to view the property with employees in the single-family home division in that area. (Id. at 11-12). TMC's practice and custom is for the board members to make the final decision on any property purchases: the board would "normally receive the presentation from the city manger with and through Joe [Campus] to the board, and based on those recommendations, we would make the decision to – to purchase the land." (Id. at 15-16).

TMC's city managers had primary responsibility for performing the due diligence on the properties to present to TMC for purchase as well as compiling the information necessary to present the properties to the TMC Board. (Doc. 254-3 (Aff. Saba at ¶¶3-6, 10)). Presentations about the properties were given by the city managers during the property tours. (Id. at ¶¶6, 10). Specifically, the City Manager and TMC Senior Vice-President Saba was crucial to this process. "He [Saba] was responsible for everything[]" according to TMC board member Stefan. (Doc. 238-2 (Dep C.Stefan at 39)). Saba transmitted the information about properties to consider for purchase through Campus to the TMC board. (Doc. 238-10 (Dep. D.Kelly at 17)). According to Saba, "I was responsible for identifying properties for purchase and development in the Pensacola market; pre-purchase due diligence on properties, including development of the pro forma, negotiations with sellers, and otherwise determining feasibility for development; presenting properties to the board of directors and making purchase recommendations; and the post-purchase development, construction, and sale of single family lots and homes." (Doc. 254-3 (Aff. Saba at ¶3)).

Saba prepared a pro forma for the property to determine the expected developed lot cost.

The pro forma contained the price of the land, estimated development, engineering, legal, utility, amenity and contingency costs.[4]  The pro forma did not include information regarding the identity of the seller, how long the seller owned the property or how much the seller had paid for the property nor did the TMC board ask for or require such information before making a decision to purchase.  (Doc. 254-3 (Aff. Saba at ¶4)).  See also (Doc. 254-2 (Aff. Campus at ¶9)).  Information presented to the TMC board also  included a map of the area, a layout of the proposed subdivision, any amenities that might be proposed.  (Doc. 238-11 (Dep. J.Saint at 59)).

Regarding the properties at issue in this case, Saba stated that he "had primary responsibility for the identification, due diligence, and presentation of each" of the properties (with the exception of Loxley 16 and Stapleton 70).  Saba stated that he "recommended the Properties [Badgad 80, Dogwood/Capri, Magnolia Bend, Medicine Bow and Pond Creek] to the Board for purchase because I thought acquisition and development of the Properties was in the best interests of TMC based on the expected development costs and anticipated demand for single family homes under the circumstances existing at the time." (Doc. 254-3 (Aff. Saba at ¶¶5-6)).  Additionally, Saba testified that "the [TMC] Board did not ask for or require any specific information regarding the identity of the seller(s), the ownership history of any of the Properties, or the sellers' plans for disbursing the proceeds of a sale prior to deciding to purchase the Properties."  (Id. at ¶11).

A tour of the property with the TMC board members would typically be arranged by Campus.  (Doc. 238-11 (Dep. J.Saint at 56-57)).  According to Campus, prior to the tours, the City Manager Saba and Senior Vice-President Stephen Schuhmann performed the due diligence on the

---

[4]  A pro forma also included whether the development would be built in phases; any off-site improvements; information on the availability of utilities, water and sewer; and due diligence items. (Doc. 238-11 (Dep. J.Saint at 59-60)).

properties and compiled the information for the TMB board that went into the pro formas.  (Doc. 254-2 (Aff. Campus at ¶¶5, 7)).  Campus states that he did not participate in these presentations because he had been instructed by TMC's President, Saint, to let the city managers make the presentations and purchase recommendations to the board.  (Id. at ¶10).  The final pro formas provided to the TMC board included the best cost estimates based on the information available prior to purchase and the commencement of development.  (Id. at ¶8).  Campus stated that the TMC board did not require information about the sellers of the properties or the ownership history before deciding to purchase.  (Id. at ¶7).  Campus testified as well, that his decision to purchase or to endorse the purchase of a property "finishes" with a recommendation from the city and sales managers that TMC purchase it "based on everything that they know."  (Doc. 254-4 (Dep. J.Campus at 376)).  According to Campus, he did not recommend (verbally or in writing) property to the TMC board.  (Id. at 261).  When the properties came up for a vote at the TMC board meeting, Campus states that he "abstained."  (Id. at 360).

According to TMC CFO Boney, when TMC evaluates property to determine whether to purchase it for a single-family subdivision, TMC does not order an appraisal of the property, rather the lender who finances that property for TMC in most all cases orders the appraisal.  (Doc. 273-2 (Dep. L.Boney at 5); Doc. 245-4 (Dep. L.Boney at 94)).  Boney testified: "I mean we're real estate professionals. And we were able to evaluate whether a purchase is at an appropriate price for our purposes."  Doc. 245-4 (Dep. L.Boney at 21)).  TMC board member Stefan testified that he has "never read an appraisal of a single-family land purchase by the company."  (Doc. 238-2 (Dep. C.Stefan at 64)).  Boney testified that TMC was not so concerned with the cost of the property, instead, the concern was the cost per lot once the property was developed.  (Doc. 245-4 (Dep. Boney

at 94-95)).  For TMC, the developed lot cost was a factor in the purchase consideration but not the determinative one; TMC liked for the price of the property to be in a target development range of 12-15% of the total cost of production.  (Doc. 238-11 (Dep. J.Saint at 65, 148)).

At the time that TMC acquired each property at issue in this case, TMC's officers and directors – including Campus – believed that the acquisition of the property was in the best interest of TMC.  (Doc. 254-3 (Aff. Saba at ¶6); Doc. 238-4 (Dep J.Campus at 359-360)).  According to TMC CFO Boney, TMC would not have purchased the properties if it thought that after developing them, TMC would lose money.  (Doc. 245-4 (Dep. Boney at 95)).

TMC board member Kelly testified that when deciding whether to purchase properties, the board relied on "input from everyone" including John Saint, Chuck Stefan and "in most cases, the city manager [Saba]."  (Doc. 238-10 (Dep. Kelly at 19-20).  Kelly testified, however, that for him personally, "my gut feeling always came down to" what Campus recommended.  (Id. at 19, 21)  He added, however, that he would not look at the pro forma in "any great detail[]" and that he made the decision about whether to approve buying property by deciding whether it would be profitable for TMC based on the sales projections and profit projections.  (Id.)

TMC President Saint testified that "[a] lot" of the board's decision to buy a property or not "had to do with the recommendations of Joe [Campus] _and_ the people who ran that particular single-family city, city manager [Saba] and the sales manager."  (Doc. 238-11 (Dep. J.Saint at 57) (emphasis added)).  Saint testified that he gave serious consideration to the pro forma that was provided to him.  (Id. at 147).

### b.      The Properties

During 2005-2006, while Campus was employed for TMC as an officer and director, he

received various payments from Young or one of Young's LLCs when TMC purchased certain properties from Young or one of Young's LLCs.  These properties are known as Bagdad 80, Dogwood/Capri, Dogwood/Magnolia Bend, Medicine Bow/Holly Cliff, Pond Creek 50, Loxley 16 and Stapleton 70, and the details of these transactions include as follows:

|  | TMC PURCHASE PRICE | BANK APPRAISAL | ROGERS APPRAISAL | PAYMENTS TO CAMPUS |
|---|---|---|---|---|
| **BAGDAD 80** | $3,200,000 | $3,200,000 (as is) $7,800,000 (developed) | $3,200,000 | $800,000 |
| **DOGWOOD/CAPRI** | $630,000 | none provided | $670,000 | $105,000 |
| **DOGWOOD/ MAGNOLIA** | unknown | none provided | none provided | unknown |
| **MEDICINE BOW/ HOLLY CLIFF** | $2,514,000 | $2,650,000 (as is) $5,800,000 (developed) | $2,000,000 | $266,000 |
| **POND CREEK 50** | $250,000 deposit (no close) | none | $1,800,000 | unknown |
| **LOXLEY 16** | $580,000 | $500,000 (as is) $1,620,000 (developed) | $580,000 | $98,165.75 |
| **STAPLETON 70** | $2,100,000 | $2,025,000 (as is) $3,575,000 (developed) | $2,325,000 | $300,000 |

### Bagdad 80

In August 2004, Pensacola real estate broker John Connell contacted Campus to see if TMC would be interested in a property that one of his agents Edyth Owens had listed at $1,200,000.  (Doc. 238-4 (Dep. J.Campus at 199-201, 248-249)).  Campus inspected the property but decided that TMC would not be "remotely interested" in it because it was in a place called Bagdad.  (Id. at 200-201, 206).  Campus contacted John January, a friend, to assess his interest in the property; even though January thought the price was too high, he, according to Campus, gave Campus permission to sign his name to a contract to purchase the property at that price; Campus also listed himself as a broker where he would get 4% of the purchase price.  (Id. at 201-204, 206).  Campus testified that January

would receive an undivided 1/3 interest in the property which he would later assign to Campus and/or Young. (Id. at 204, 207-208, 212). Campus paid $5,000 to own the option on the contract. (Id. at 212). TMC was never informed about this deal because according to Campus, it "was outside of the realm of anything" that he was responsible for and that TMC expected him to do. (Id. at 206). On November 5, 2004, an Assignment of Contract Rights indicates that January (through Campus) assigned the sales contract to JAY Consulting, LLC (Young). (Doc. 238-4 (Dep. J.Campus at 212-213)). Campus called Young and told him that he had an option on 80 acres. (Id. at 215). Campus and Young decided to purchase the property in the name of Bagdad 80, LLC, which the two men formed on January 5, 2005 (each owning 50%). (Id. at 218-219). JAY Consulting, LLC assigned its interest to Bagdad 80, LLC, which purchased the property for $1,200,000 on January 6, 2005. (Id. at 225-226; Doc. 238-12). On January 26, 2005, Campus sent a letter to a bank which attached a pro forma dated October 14, 2004; he predicted he would make $1,073,500. (Doc. 238-4 (Dep. J.Campus 225-226)).

Over a year later in February 2006, Paul Saba ("Saba") of TMC, called Young about the property.[5] (Id. at 222-223, 241-249)). Campus met with Saba to have him look at the property; Campus did not tell Saba that he owned ½ of the property. (Doc. 238-4 (Dep. J.Campus at 221-223)). Campus did not offer the property to TMC as "[i]t was not on the market[,]" but "[i]t was a good purchase" for TMC when they later purchased it; Campus advocated to TMC that it buy the property at the price of $3,200,000. (Id. at 248-249). Young set the sales price which had a 5% commission or fee for Campus included. (Id. at 255-257). TMC purchased the property (Saba

---

[5] According to Saba, he would not have recommended the property for purchase and development by TMC in 2004; however, in February 2006, because the property was in the path of development in the Pensacola market and after performing due diligence, he recommended its purchase to the TMC board at the price of $3,200,000. (Doc. 254-3 (Aff. Saba at ¶¶8-9)).

signed on behalf of TMC) from Bagdad 80, LLC on April 10, 2006 for $3,200,000.  (Doc. 238-13).

Campus testified that TMC was not aware at that time that he was a member of Bagdad 80, LLC or

that he would receive payment.  (Doc. 238-4 (Dep. J.Campus at 223-224, 248-249)).  Campus

received $800,000.  (Id. at 223-224).  The HUD-1 Settlement Statement did not show any payment

to Campus.  (Doc. 238-17 (Dep. E.Matthews at 98)).  On April 17, 2006, Young filed an affidavit

(dated and executed on April 10, 2006) in probate court, which identified he and Campus as the

members of Bagdad 80, LLC.  (Doc. 238-15).  Matthews, the closing attorney, testified that he

prepared the affidavit which identified its members for the transaction, and while not sure, "would

think" he would have provided a copy ... to TMC because "we send them closing documentation[]"

and "I certainly didn't withhold it from them." (Doc. 254-6 (Dep. E.Matthews at 113-114)).

    A June 27, 2006 appraisal from Bank of America valued the property at $3,200,000 ("as is"

value as of June 27, 2006) and $7,800,000 ("subject to completion" value as of December 27, 2006).

(Doc. 254-11).  A May 2007 appraisal from Michael J. Rogers (retained by Campus) retroactively

valued the property at $3,200,000 at the time of the transaction.  (Doc. 254-10 (Aff. Rogers at ¶7).

TMC President Saint testified that he has not given any thought as to what would or should have

been an appropriate purchase price for TMC.  (Doc. 245-9 (Dep. J.Saint at 152-153)).

### Dogwood/Capri

    Allan Bell had an 11-acre property in Santa Rosa County, Florida, under contract to purchase

for $335,000.  (Doc. 238-8 (Dep. J.Young at 69-70, 117-118, 122-123)).  Bell priced the property

at $630,000 and presented it to Saba.  (Id. at 117-118, 122).  Saba liked the property but stated that

TMC could not act on it within the time requirements of the contract between Bell and the original

owner.  (Id.)  Saba told Campus about the property and stated that he thought it would be "a good

condo site." (Doc. 249-2 (Dep. J.Campus at 145-146)). Because TMC could not meet the closing

date, Bell took it to Young who purchased his rights in the contract for $75,000 (assignment fee) and

reimbursed him for his $5,000 earnest money deposit and negotiated with the owner for an extension

of the closing date. (Doc. 238-8 (Dep. J.Young at 117-118, 122); Doc. 249-2 (Dep. J.Campus at

149-150)). Young bought the property for $335,000. (Doc. 238-8 (Dep. J.Young at 122)).

On March 8, 2005, Campus and other TMC board members toured the property and Campus

prepared a pro forma which contained a sales price of $630,000. (Doc. 238-4 (Dep. J.Campus at

181-188)). Campus testified that after the tour, Saba told him to "do what he needed to do" and that

he was going to contact Bell. (Id. at 186-187). Also on this date, Campus sent a fax to Young

stating that he "need[ed] an agreement . . . to sell at 630,000. (Id. at 187-188).

Saba performed the due diligence on this property, conducted presentations on tours with the

board and recommended the property for purchase "after concluding that it fit TMC's criteria for

purchase and development." (Doc. 254-3 (Aff. Saba at ¶10)). Campus stated that price of $630,000

was the price that was quoted to TMC and that the price was Young's price for the property.

Campus stated that he did not know if Young would have taken less. Campus testified that he did

not set the price. (Doc. 238-4 (Dep. J.Campus at 188-190)). Following the tour of the property by

the TMC board, TMC purchased the property on May 16, 2005 from JAY Consulting, LLC (Young)

for $630,000. (Id. at 187-188; Doc. 238-16; Doc. 238-8 (Dep. J.Young at 122-123).

Young paid Campus $105,000 as part of this transaction "[j]ust because I'm a generous guy."

(Doc. 238-8 (Dep. J.Young at 123-124); Doc. 238-4 (Dep. J.Campus at 189)). Campus testified that

he should have paid that money back to TMC "[i]n retrospect, I should have." (Doc. 238-4 (Dep.

J.Campus at 189)). Campus did not tell anyone at TMC that he received the payment. (Id.) He

13

made the decision to keep the money because he had a clear mind and clear conscience because he "always made sure that any project that The Mitchell Company purchased was feasible and had a huge percentage of being profitable." (Id.)  The HUD-1 statement for this transaction between JAY Consulting, LLC and TMC did not show the payment to Campus.  (Id. at 178-179, 189)).  The closing attorney Matthews testified that if he had known of any payment to Campus, it would have been fully disclosed on the HUD-1 statement.  (Doc. 238-17 (Dep. Matthews at 63-69, 97-98).  It is Matthews opinion that if Young knew that Campus was receiving payment, Young's execution of the certification would be false.  (Id. at 69, 100-101).

A May 2007 appraisal from Rogers (retained by Campus) retroactively valued the property at $670,000 at the time of the transaction. (Doc. 254-10 (Aff. Rogers at ¶7)).  TMC President Saint testified that "I haven't given it any thought[,]" when asked what would have been an appropriate price for TMC.  (Doc. 245-9 (Dep. J.Saint at 152)).  Saint has not reviewed the appraisal and does not consider it relevant to his determination that the property has zero value. (Id. at 153-155).

### Dogwood/Magnolia Bend

Paul Peters and Dr. Yehia Ibrahim owned this property.  (Doc. 238-11 (Dep. J.Young at 127-129)).  Young was searching for properties and ran into Peters, who agreed to sell.  (Id.)  Young then contacted Campus to see if TMC would be interested in purchasing the property. Campus viewed the property but decided it would not fit for TMC because the access was poor.  (Id. at 128).  Young approached adjoining landowner Ibrahim and purchased his property which provided for multiple access, ingress and egress.  (Id. at 128-129).  Young took the property back to Campus, who later came back with a price and said "it will work now."  (Id. at 129).

Campus and Saba prepared the pro forma and took the TMC board on a tour and the TMC

board agreed to purchase the property.  (Doc. 238-4 (Dep. J.Campus at 193)).  Specifically, Saba performed the due diligence on this property, conducted presentations on tours with the TMC board and recommended the property for purchase "after concluding that it fit TMC's criteria for purchase and development."  (Doc. 254-3 (Aff. Saba at ¶10)).  TMC purchased the property from JAY Consulting, LLC (Young).  (Doc. 238-4 (Dep. J.Campus at 193)).  Campus testified that he received payment but did not recall the amount.  (Id. at 193-195).  TMC was unaware of any payment to Campus.  (Id. at 195).  However, Young testified that he did not think there was any payment to Campus.  (Doc. 238-8 (Dep. J.Young at 125-127)).

### Medicine Bow/Holly Cliff

Joshua Wilson contacted Young about buying this 70-acre property which Young owned with his wife. Young quoted the price as $34,500/acre with a total price of $2,346,000 (with a reduction from $2,415,000).  (Doc. 238-8 (Dep. J.Young at 135, 136, 139, 143)).  Wilson did not purchase the property.  (Id. at 135). Young and Campus later discussed the property and Young offered to sell it to TMC for $2,666,000, then reduced it to $2,514,000.  (Id. at 139-141, 144; Doc. 245-9 (Dep. J.Saint 160-161)).

Campus presented the property to Saba and a pro forma was prepared for review by the TMC Board. (Doc. 238-4 (Dep. J.Campus at 257-260)).  Specifically, Saba performed the due diligence on this property, conducted presentations on tours with the TMC board and recommended the property for purchase "after concluding that it fit TMC's criteria for purchase and development." (Doc. 254-3 (Aff. Saba at ¶10)). On April 18, 2006, TMC purchased the property from Young for $2,514,000.  (Doc. 245-2; Doc. 238-8 (Dep. J.Young at 139-140)).  Three Seas, LLC (Campus and his son) received a $266,000 payment from Young and his wife; Young paid Three Seas, LLC

because Campus brought a bona fide buyer to the closing table. (Doc. 238-4 (Dep. J. Campus at 263-264); Doc. 238-8 (Dep. J. Young at 141-142, 144)). Neither Saba nor TMC were aware of the payment to Three Seas, LLC. (Doc. 238-4 (Dep. J. Campus at 255-256, 470-471)). Young testified that he would have sold the property to TMC at the price quoted to Wilson if there had been no fees associated with bringing a buyer to him. (Doc. 238-8 (Dep. J. Young at 145)). A June 27, 2006 appraisal by Bank of America valued the property at $2,650,000 ("as is" value as of June 27, 2006) and $5,800,000 ("subject to completion" value as of December 27, 2006). (Doc. 254-12; Doc. 245-15). A May 2007 appraisal by Rogers (retained by Campus) retroactively valued the property at $2,000,000 at the time of the transaction. (Doc. 254-10 (Aff. Rogers at ¶7)).

### Pond Creek

On January 31, 2006, Young executed an agreement to purchase this 50-acre property for $37,000/acre. (Doc. 238-4 (Dep. J. Campus at 332, 339); Doc. 238-8 (Dep. J. Young at 175)). Young decided to sell the property. Campus learned of this and prepared a pro forma. The TMC Board took a tour of the property. (Doc. 238-4 (Dep. J. Campus at 339-340)). On February 16, 2006, Campus sent Young a note stating that he met with Saba on that date about the property and indicated "55,000 at 50.83 AC." (Id. at 340-341; Doc. 238-18). Campus and Saba decided not to purchase the property at $55,000/acre because the lot cost was too much for TMC to be able to build homes profitably (because zoning only allowed for 128 lots). (Doc. 238-4 (Dep. J. Campus at 337-338)).

Young approached Campus after "the turndown from" TMC, and asked if he wanted to join his LLC with Bell (Pond Creek 50, LLC). (Id. at 338-339). On May 6, 2006, Young and Bell

agreed to make Three Seas, LLC (Campus and his son) a member of Pond Creek 50, LLC.[6]  (Id. at 338; Doc. 238-8 (Dep. J.Young at 168, 170)).  Three Seas, LLC obtained a 1/3 interest in Pond Creek 50, LLC.  (Doc. 238-8 (Dep. J.Young at 170)).  Next, Young obtained rezoning approval from the Santa Rosa County zoning commission for the property to be rezoned to accommodate 200 lots. (Doc. 238-4 (Dep. J.Campus at 343, 345-346)).  TMC became interested in the property.  (Id. at 343-344).  Saba performed the due diligence on this property, conducted presentations on tours with the TMC board and recommended the property for purchase "after concluding that it fit TMC's criteria for purchase and development."  (Doc. 254-3 (Aff. Saba at ¶10)).

On June 7, 2006, Campus, for TMC, executed an agreement to purchase the property for $55,000/acre from Pond Creek 50, LLC.  (Doc. 238-4 (Dep. J.Campus at 332, 334).  TMC paid $250,000 as a down-payment, to delay the closing.  (Id. at 358; Doc. 238-11 (Dep. J.Saint at 124)). On June 12, 2006, Pond Creek 50, LLC purchased the property for $37,000/acre.  (Doc. 238-4 (Dep. J.Campus at 332)).  TMC did not close on the property.[7]  (Id. at 354-355).  According to Campus, TMC defaulted.  (Id. at 358).  Pond Creek 50, LLC distributed the $250,000 from TMC to its members - about $83,000 each.  (Id.)  Pond Creek 50, LLC offered to return the money to TMC at one point in time but ultimately did not do so due to TMC's breach in failing to close timely.  (Doc. 254-7).  A May 2007 appraisal from Rogers (retained by Campus) retroactively valued the property at $1,800,000 at the time of the transaction. (Doc. 254-10 (Aff. Rogers at ¶7)).

_____

[6] Campus did not see any conflict with his employment at TMC and becoming part of Pond Creek 50, LLC.  (Id. at 346).

[7] According to TMC President Saint, this is because "at the time we uncovered Mr. Campus' theft, this became known to us, and we decided not to buy it."  (Doc. 245-9 (Dep. J.Saint at 222)).  Saint testified that TMC had no interest in July 2007 of going forward with the purchase "[p]rimarily because of what we felt was a conspiracy between Mr. Young and Mr. Campus."  (Id. at 227).

**Loxley 16**

Broker Ronald Swain contacted Campus to see if he would be interested in viewing a 16-acre property for which Swain (or S&P of Northwest Florida, Inc.) held an option to purchase. (Doc. 238-4 (Dep. J.Campus at 276, 296)). Campus agreed to view the property and did so in his capacity as a TMC employee. (Id. at 278). Campus contacted Swain and indicated that the property did not appear suitable for TMC. (Id. at 279). Campus requested that Rester & Coleman Engineers estimate the property's development cost. (Id. at 281-283). Campus decided that the property might be one that he and/or Young would like to purchase to hold and so he contacted Young. (Id. at 290). Loxley 16, LLC (Young) executed a contract to purchase the property from S&P of Northwest Florida, Inc. (Id. at 296, 296-299). Campus signed Young's name to this contract because, according to Campus, Young gave him permission as Three Seas, LLC and Young were going to purchase the property together. (Doc. 238-4 (Dep. J.Campus at 300)). On February 28, 2006, Loxley 16, LLC purchased the property for $368,000. (Id. at 301-302).

Steve Schuhman of TMC later contacted Campus stating that TMC needed some land. Campus responded that he knew of a property but that the topography looked rough. (Id. at 303-305). Campus told Schuhman to look at the Loxley 16 property. Campus did not tell Schuhman, or anyone at TMC, that he owned 50% of the property and in retrospect stated "I wish I had. And I should have." (Id. at 305-306, 313). On May 1, 2006, TMC entered into an agreement to purchase the property from Loxley 16, LLC for $580,000. (Id. at 312-313).

At closing Loxley 16, LLC paid Three Seas, LLC $98,165.75. (Id. at 317, 319-320)). The Loxley 16, LLC ledger lists this payout (along with another to another entity) as "commissions." (Id. at 316; Doc. 238-20). Campus did not inform TMC that Three Seas, LLC (Campus and his son)

18

would receive payment.   (Doc. 238-4 (Dep. J.Campus at 306, 313, 470-471)).   The HUD-1 statements for this transaction did not show that Three Seas, LLC received payment from Loxley 16, LLC for this transaction.  (Doc. 238-21).  The closing attorney Matthews testified that if he had known of any payment to Campus it would have been fully disclosed on the HUD-1 statement. (Doc. 238-17 (Dep. Matthews at 133-136, 139).  It is Matthews opinion that if Young knew when he signed the certification that Campus was going to be paid a commission, it would be a false statement by Young.  (Id.)  Campus testified that he wished he had not taken the fee – he should have "passed" the fee on to TMC.  (Doc. 238-4 (Dep. J.Campus at 321)).

A June 27, 2006 appraisal from Compass Bank valued the property at $500,000 ("as is" value as of June 7, 2006) and $1,620,000 ("at completion" value as of December 24, 2006).  (Doc. 254-13; Doc. 245-16).  A May 2007 appraisal by Rogers (retained by Campus) retroactively valued the property at $580,000 at the time of the transaction. (Doc. 254-10 (Aff. Rogers at ¶7)).

### Stapleton 70

On March 8, 2006, Campus executed Young's signature on an offer to purchase this 70-acre property in the name of JAY Consulting, LLC (Young) or assigns for $1,200,000.  (Doc. 238-4 (Dep. J.Campus at 362, 365)).  JAY Consulting, LLC transferred its interest in the property to Stapleton 70, LLC (Young).  (Id. at 363-365; Doc. 238-22).

By March 25, 2006, based on a strong recommendation from Steve Schuhman, Campus advocated that TMC purchase the property for $2,100,000.  (Doc. 238-4 (Dep. J.Campus at 366, 375)).  TMC President Saint testified that city manager Saba and sales manager David Kahalley were in favor of purchasing and developing this property.  (Doc. 245-9 (Dep. J.Saint at 205)). On April 12, 2006, Stapleton 70, LLC and TMC entered into a contract for the sale of the property to

TMC.  (Id. at 365).  On July 7, 2006, TMC assigned its interest in the property to MBT Investments,

LLC and MBT Investments closed on the property on July 28, 2007.  (Doc. 238-23; Doc. 238-24).

On July 27, 2006, MBT purchased the property from Stapleton 70, LLC for $2,100,000.  (Doc. 238-

23).  On June 19, 2007, TMC executed an agreement agreeing to repurchase the property from MBT

for $2,100,000 plus costs incurred if TMC and MBT did not execute a contract for development of

the property and sale of residential lots within six months.  (Doc. 238-25).

    After closing, $300,000 was disbursed to Three Seas, LLC (Campus and his son). Campus

did not tell Saint that he stood to make $300,000.  (Doc. 238-4 (Dep. J.Campus at 366, 373-374)).

A June 21, 2006 appraisal by Compass Bank valued the property at $2,025,000 (for "as is" value)

and $3,575,000 (for "at completion" value as of December 24, 2006).  (Doc. 254-14; Doc. 245-17).

A May 2007 appraisal by Rogers (retained by Campus) retroactively valued the property at

$2,325,000 at the time of the transaction. (Doc. 254-10 (Aff. Rogers at ¶7)).

**c.    Conflicts & Duties**

    TMC's Code of Ethics provides that employees are expected to conduct their private

business and personal activities in a manner which avoids conflict with the interests of TMC or its

customers, and defines a conflict as "any situation where an individual has two or more duties or

interest that are mutually incompatible." (Doc. 238-30).  TMC also required employees like Campus

to sign a Disclosure Form because "while endeavors and investments competitive with those of the

Company are not automatically prohibited, the Company believes it should know of their existence

and be able to determine any resulting conflict of interest."  (Doc. 249-17).[8]  The"Competitive

---

[8]  Lisa Williams testified about the need for an employee to get prior approval from TMC
President Saint, before doing business with TMC.  (Doc. 245-12 (Dep. L.Williams at 24, 26)).  Williams
testified that TMC requires employees to fill out a disclosure form for any business dealings that they
have with the TMC or want to have with TMC.  (Doc. 249-10 (Dep. L.Williams at 27, 29); Doc. 249-17

Interest" section provides that "the employee has, or will have following employment . . . no active or inactive direct or indirect involvement as an owner, partner, member, shareholder, director, manager, or officer in any business or investment competitive with[]" TMC.  (Id.)

Campus testified that he owed duties to TMC including his efforts, commitment and honesty. (Doc. 238-4 (Dep. J.Campus at 144)).  "The Mitchell Company comes first[,]" for Campus when he was determining whether TMC or he would be interested in purchasing a property.  (Id. at 278). Campus testified that while he should have told TMC about his interests and payments, he "always made sure that any project that The Mitchell Company purchased was feasible and had a huge percentage of being profitable."  (Doc. 238-4 (Dep. J.Campus at 189)).  Campus testified: "I don't think I did anything wrong on any of these. My first . . . allegiance was to The Mitchell Company. . . . when I made the recommendations or endorsed the recommendations of my guys to buy these properties and The Mitchell Company made the decision to purchase these properties, they were good properties at that particular time in the marketplace. And I did nothing wrong. And I contend that I have still not done anything wrong."  (Doc. 254-4 (Dep. J.Campus at 359)).  Campus testified that "I got the best price that I could from every seller."  (Id. at 390)).

TMC President Saint testified that directors/officers were not required by the TMC board to make conflicts known to the board, but believed that if there was one, he or she "would have had to make that known[.]"  (Doc. 238-11 (Dep. J.Saint at 64)).  According to Saint, Campus engaged in fraud with regard to TMC (by selling TMC properties at grossly inflated prices) because he had a duty to tell TMC who was involved in the transactions and he breached his fiduciary duty both as a director and officer because he withheld information that he should have shared with TMC; he was

_____

(2/1/1999 Disclosure of Interest Memo)).

21

"feather[ing] his own nest" and "[o]bviously not spending 100 percent of his time in advancement of The Mitchell Company's objectives." (Id. at 108-109). Saint testified that Campus was expected to secure the lowest price for TMC.  Saint could not recall if there was any discussion at TMC about someone going back to the seller and asking for a better price for any of the properties at issue in this case.  (Doc. 245-9 (Dep. J.Saint at 69-71, 228-229)).   Saint added, however, that an "independent judgment" of the value of the properties is not something he looks at when deciding whether TMC should purchase properties.  (Id. at 236).

TMC Vice-President and City Manager Saba stated in his Affidavit that (with the exception of Loxley 16 and Stapleton 70): "I recommended the Properties [Badgad 80, Dogwood/Capri, Magnolia Bend, Medicine Bow and Pond Creek] to the Board for purchase because I thought acquisition and development of the Properties was in the best interests of TMC based on the expected development costs and anticipated demand for single family homes under the circumstances existing at the time."  (Doc. 254-3 (Aff. Saba at ¶¶5-6).  Additionally, "the [TMC] Board did not ask for or require any specific information regarding the identity of the seller(s), the ownership history of any of the Properties, or the sellers' plans for disbursing the proceeds of a sale prior to deciding to purchase the Properties."  (Id. at ¶11).

Young testified that he "never, never saw a pro forma from his [Campus'] job to the board." (Doc. 238-8 (Dep. J.Young at 93-94)). Young testified that he "set the price on the properties[]" and "did not" have inside information as to what requirements TMC would consider in purchasing a piece of land.  (Id. at 99).  According to Young, "[i]t is my opinion that The Mitchell Company paid fair market value for the Bagdad, Holley Cliff, Dogwood, Magnolia, and Loxley properties[]" that "MBT Investments, LLC paid fair market value for the Stapleton property[]" and that "the price at

which The Mitchell Company contracted to purchase the Pond Creek property represented the fair market value of the property." (Doc. 249-15 (Aff. J.Young at ¶5)). Young stated that Campus told him that TMC did not care what investments he made as long as he kept the TMC Single Family division profitable. (Id. at ¶4).

TMC board member Stefan testified that he has was not aware of any evidence that would indicate that Jim Young provided any input into the pro formas or that Young even knew aboutthe pro formas for the properties at issue. (Doc. 245-11 (Dep. C.Stefan at 171-172)).

### d.    The Termination

On March 6, 2007, TMC President Saint called a meeting to discuss certain properties with other TMC Board Members; Campus was asked to explain the appraisal for the Stapleton property transaction in Baldwin County, Alabama, because there was an indication in the appraisal that there was a property flip right at the time that TMC purchased the property. (Doc. 238-28 (Dep. L.Boney at 56-58); Doc. 238-2 (Dep. C.Stefan at 63-66)). According to Stefan, Campus denied any involvement in the flip and said that it was unfortunate and had taken place without his knowledge. (Doc. 238-2 (Dep. C.Stefan at 66-67)). Stefan asked Campus why he did not tell them that his friend, Young, was involved; Campus responded that Young was not a close friend. (Id. at 66-67). According to Boney, following this meeting, TMC decided not to terminate Campus based on his denials of any wrongdoing and because some board members (such as Kelly) believed that there had just been a mistake and there was no problem. (Doc. 238-28 (Dep. L.Boney at 72, 75); Doc. 238-2 (Dep. C.Stefan at 72, 75)). Also on this day, TMC CFO Boney visited Campus' office at TMC in Pensacola, Florida to secure the files in that office. (Doc. 238-5 (Aff. Boney at ¶5)). Boney entered Campus' office and gathered all of his files and documents, which included personal medical

records, tax returns, bank records and other financial records in addition to TMC business records. (Doc. 109 at 2-4; Doc. 273-2 (Dep. L.Boney at 190-193)).

On March 7, 2007, Campus called Saint and told him that he had received approximately $1.6 million from the sale of properties to TMC.  (Doc. 238-4 (Dep. J.Campus at 470-471); Doc. 238-11 (Dep. J.Saint at 95-96); Doc. 238-28 (Dep. L.Boney at 56-58)).  Prior to this date, TMC was not aware that Campus was receiving payments.  (Id.)  TMC terminated Campus due to concerns over breach of his obligations to TMC.  (Doc. 238-2 (Dep. C.Stefan at 76); Doc. 238-6 (3/7/07 termination letter)).

## II.    Discussion[9]

## A.    Standard of Review

Summary judgment should be granted only if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).[10]  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323

---

[9]  As set forth in this Court's prior Order (Doc. 165), Florida law governs.

[10]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted: "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

(1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted).  The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

**B.    Application**

TMC's Second Amended Complaint asserted the following claims:[11] Count One-intentional, willful and reckless fraud against Campus; Count Two- negligent or mistaken fraud against Campus; Count Three- suppression against Campus; Count Four- breach of fiduciary duty against Campus; Count Five- negligence against Campus; Count Six- wantonness against Campus; Count Seven- common law civil conspiracy against Campus and Young; Count Eight- conversion against Campus and Young; Count Nine- officer and director's liability against Campus; Count Eleven- violation of Alabama Trade Secrets Act against Campus and Young; Count Twelve- disgorgement against Campus and Young, and Count Thirteen- unjust enrichment against Campus and Young.  (Doc. 79).

---

[11]  Defendant (and attorney) Eddie Matthews has been dismissed and as such, none of these claims, to the extent he was named in same, remain pending against him (this includes Count Ten which is not listed here, because that claim was for professional negligence specifically as to Matthews).

In response, Campus asserted counterclaims against TMC for breach of contract, fraudulent inducement, fraudulent concealment, wrongful intrusion/invasion of privacy, false light invasion of privacy and slander.  (Doc. 106).

Presently, TMC moves for partial summary judgment on its claims for fraudulent concealment/suppression (Counts One and Three), breach of fiduciary duty (Count Four) and civil conspiracy (Count Seven), as well as on all of Campus' counterclaims.  Campus moves for partial summary judgment on TMC's claims against him for negligent misrepresentation (Count Two), negligence (Count Five), wantonness (Count Six), conversion (Count Eight), unjust enrichment (Count Thirteen) and disgorgement (Count Twelve), as well as on his counterclaim for invasion of privacy (Count Two).  TMC's claims for conversion (Count Eight), misappropriation of trade secrets (Count Eleven) and unjust enrichment (Count Thirteen), have been dismissed (Docs. 75, 165, 267) and TMC has conceded its wantonness claim (Count Six) (Doc. 250 at 8-9).  Additionally, the Florida Supreme Court has expressly declined to recognize false light invasion of privacy as a viable cause of action.  See Jews for Jesus, Inc. v. Rapp, 997 So.2d 1098, 1100, 1114 (Fla. 2008) (holding that "we decline to recognize a cause of action for false light invasion of privacy[]").  Thus, as an initial matter, it is **ORDERED** that Campus' motion for partial summary judgment as to TMC's claims for conversion and unjust enrichment is **MOOT** but his motion as to TMC's claim against him for wantonness is **GRANTED;** and TMC's motion for partial summary judgment as to Campus' counterclaim for false light invasion of privacy is **GRANTED,** as a matter of law.

Before turning to the specific claims which remain for summary judgment review, the Court addresses Young's and Campus' argument that all the tort claims are barred by the economic loss rule.  Defendants assert that TMC's tort claims are barred by the Florida's economic loss rule

because all of TMC's claimed damages are purely economic losses traceable to TMC's contractual relationship with Campus through his Employment Agreement and Disclosure of Interest contract. In other words, that absent the TMC-Campus contractual employer/employee employment relationship, TMC would have no claims against Campus because Campus' acts caused no separate or distinct harm.

The economic loss rule precludes a tort action for economic damages where a defendant has not committed a breach of duty apart from a breach of contract.  See, e.g., Indemn. Ins. Co. of North America v. American Aviation, Inc., 891 So.2d 532, 536-537 (Fla. 2004).  "Florida courts apply the economic loss rule to prevent tort recovery 'when damages flow from a breach of contract unless the tort is independent of the breach of contract.'" Eye Care Intern., Inc. v. Underhill, 92 F. Supp. 2d 1310, 1314-1315 (M.D. Fla. 2000).  Additionally, as recently articulated in Nationwide Mut. Co. v. Ft. Myers Total Rehab Center, Inc., 2009 WL 2495616, *5 (M.D. Fla. Aug. 13, 2009):

> The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." Indem. Ins. Co. v. Am. Aviation, Inc., 891 So.2d 532, 536 (Fla.2004).  See also Jones v. Childers, 18 F.3d 899, 904 (11th Cir.1994) (citing Interstate Sec. Corp. v. Hayes Corp., 920 F.2d 769, 773 (11th Cir.1991)). In the context of contractual privity, the economic loss rule "is designed to prevent parties to a contract from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort." Am. Aviation, 891 So.2d at 536. One of the recognized exceptions, however, permits a tort action where the tort was committed independently of the contract breach. Id. at 537, 543. A tort action is barred where a defendant has not committed a breach of duty apart from a breach of contract. Vesta Constr. & Design, L.L.C. v. Lotspeich & Assocs., Inc., 974 So.2d 1176, 1179 (Fla. 5th DCA 2008).

Moreover, in Stateline Power Corp. v. Kremer, 404 F. Supp. 2d. 1373, 1380 (S.D. Fla. 2005), the court held that the doctrine did not apply to bar a corporation from suing its former officer for breach of fiduciary duty because that claim arises "out of the common law rule against breach of

fiduciary duty, not solely out of the Employment Agreement."  Indeed, a claim for breach of

fiduciary duty is a "well-established tort" which remains viable even if there is an underlying

contract, such that summary judgment is inappropriate on such count by virtue of the economic loss

rule. See, e.g., Maliner v. Wachovia Bank, N.A., 2005 WL 670293, *8 (S.D. Fla. Mar. 1, 2005);

Invo Fla., Inc. v. Somerset Venturer, Inc., 751 So.2d 1263, 1266-1267 (Fla. 3d DCA 2000); First

Equity Corp. of Fla., Inc. v. Watkins, 1999 WL 542639, *1 (Fla. 3d DCA 1999).

Nevertheless, the Court acknowledges that Florida courts and the Eleventh Circuit (see

Interstate Securities Corp. v. Hayes Corp., 920 F.2d 769 (11th Cir. 1991) (holding that Florida's

economic loss rule barred breach of fiduciary duty claims where the relationship between the parties

arose out of a contract)),[12] have held that the economic loss rule bars a claim for breach of fiduciary

_____

[12]  After the Interstate Securities decision, the Florida Supreme Court stated that the economic
loss rule "was primarily intended to limit actions in the product liability context, and its application
should generally be limited to those contexts or situations where the policy consideration are substantially
identical to those underlying the product liability type analysis." Moransais v. Heathman, 744 So.2d 973,
983 (Fla. 1999). The Court added the rule "should not be invoked to bar well-established causes of
actions in tort...." Id.  As articulated in Stateline, 404 F. Supp. 2d at 1379-1380:

> In light of the Florida Supreme Court's Decision in Moransais, Florida's Third District Court
> of Appeals has twice ruled that the economic loss rule does not bar breach of fiduciary duty
> claims. In an unpublished 1999 decision, the Third DCA noted that, although the Eleventh
> Circuit had held the economic loss rule bars a breach of fiduciary duty claim, "[a]fter
> Moransais, Interstate Securities and its  progeny cannot be regarded as good law on this
> point." See First Equity Corp. v. Watkins, 24 Fla. L. Weekly D1758, 1999 WL 542639, *1,
> n.*** (Fla. 3d DCA, July 28, 1999). In 2000, another Third DCA opinion held that,
> "Moransais makes it clear that the economic loss rule has not abolished the cause of action
> for breach of fiduciary duty, even if there is an underlying oral or written contract." Invo
> Fla., Inc. v. Somerset Venturer, Inc., 751 So.2d 1263, 1267 (Fla. 3d DCA 2000).

> At least two Judges of the Southern District of Florida have followed the Third DCA in
> holding that Florida's economic loss rule does not bar a breach of fiduciary duty claim. Judge
> Ryskamp noted that the Third DCA explicitly stated Interstate Securities was no longer good
> law and held that the Southern District of Florida was bound by the First Equity holding. See
> Crowell v. Morgan Stanley Dean Witter Services, Co., 87 F.Supp.2d 1287, 1293
> (S.D.Fla.2000). More recently, Judge Altonaga cited Invo Florida, Inc., in holding,
> "Plaintiffs' claim for breach of fiduciary duty 'is one of those well-established torts' which
> remains viable, 'even if there is an underlying oral or written contract.' " See Maliner v.

duty where a plaintiff's claim arises solely as a result of the existence of a contract between the parties and where a plaintiff is basing such claim on a contractual obligation. Such is not the case here. Rather, TMC's breach of fiduciary duty claim arises under Florida common law due to Campus' status as an officer and director of TMC, not any particular contract or employment agreement or obligations arising thereunder. Moreover, there is no indication that any contract between Campus and TMC addressed damages for breach, such that TMC would be circumventing the allocation of losses set forth in the contract by bringing an action in tort. Thus, even though TMC alleges claims stemming from Campus' employment agreement and disclosure of interest contract, TMC's claims for breach of fiduciary duty would still exist apart from those contracts.

The same rationale holds true for fraud claims: "[i[ntentional claims such as fraud . . . and other torts requiring proof of intent generally remain viable ... [even] if the parties are in privity of contract." Indem. Ins., 891 So.2d at 543, n.3. In this instance, TMC's fraud claims are not based solely on TMC's contracts with Campus; instead, TMC's fraud claims are based upon alleged misrepresentations/omissions by Campus in inducing TMC to enter into contracts with Young or one of his LLCs to have TMC purchase prices at inflated prices.

In sum, the economic loss rule does not apply to the tort claims asserted by TMC. The Court now reviews the substance of the claims.

### 1) TMC's claim of Breach of Fiduciary Duty

TMC's breach of fiduciary duty claim against Campus is rooted in the assertion that he failed to disclose adverse interests in properties presented to TMC and that he secretly profited from same. TMC contends that even if no formal TMC disclosure policy was in place, Campus remained under

---

Wachovia Bank, N.A., No. 04-60237-CIV, 2005 WL 670293, *8 (S.D.Fla.2005).

an affirmative duty under Florida law to disclose any adverse interests to other board members and to not make a private profit while serving as an officer and board member.

In Florida, the elements of a breach of fiduciary duty claim are: 1) the existence of a fiduciary duty; 2) the breach of that duty; and 3) damage proximately caused by that breach. Border Collie Rescue, Inc. v. Ryan, 418 F. Supp. 2d 1330, 1342 (M.D. Fla. 2006). See also e.g., Patten v. Winderman, 965 So.2d 1222, 1224 (Fla. 4th DCA 2007) (citing Gracey v. Eaker, 837 So.2d 348, 353 (Fla. 2002)).  "Florida law has long recognized that corporate officers and directors owe duties of loyalty and a duty of care to the corporation."  In re Aqua Clear Technologies, Inc., 361 B.R. 567, 575 (Bankr. S.D. Fla. 2007). "Corporate directors and officers owe a fiduciary obligation to the corporation and its shareholders and must act in good faith and in the best interest of the corporation." Cohen v. Hattaway, 595 So.2d 105, 107-108 (Fla. 5th DCA 1992).

In Florida, an officer or director of a corporation will not be permitted to make a private profit from his position or while acting in that capacity, acquire an interest adverse or antagonistic to that of the corporation.  Seestedt v. Southern Laundry, 5 So.2d 859, 861 (Fla. 1942).  Florida courts citing Seestedt have explained that a breach of fiduciary occurs when the fiduciary through his personal dealings interferes with the business of the corporation, or when the fiduciary does not act with good faith and fairness in his personal dealings with the corporation.  See, e.g., Avila South Condominium Ass'n, Inc. v. Kappa Corp. 347 So.2d 599, 606 (Fla. 1977); Independent Optical Co. of Winter Haven v. Elmore, 289 So.2d 24 (Fla. 2d DCA 1974); Cohen; 595 So.2d at108.  Moreover, "one who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence." Farber v. Servan Land Co., Inc., 541 F.2d 1086, 1087, n. 2 (5th Cir. 1976).

A fiduciary may also not purchase property personally with the intention to resell the property to the corporation.  3 FLETCHER CYC. CORP. § 899 (2009).

Thus the examination in this case is three-fold.  First, in the instances where Campus acquired properties, the question of fact is whether he knowingly usurped a business opportunity which should have been given to TMC or held an interest that was adverse or antagonistic to TMC.  In the instances where Campus received a fee after TMC bought the property, the inquiry is whether he acquired the private fee as a result of his position as an officer or board member of TMC.  Third, in the instances where Campus had an interest in the properties when they were sold to TMC, the inquiry is whether the transactions were conducted in good faith and fairness.

TMC claims that Campus is liable because he had undisclosed financial or personal interests in the very properties that he recommended for purchase to TMC at grossly inflated prices such that he hoodwinked and defrauded TMC into overpaying, breaching his duties to the company. In contrast, while Campus admits that he profited from the transactions (receiving approximately $1,600,000) and did not share the existence of his interests with TMC, he contends that the properties were, in fact, the most profitable for TMC and were obtained at the best price (not grossly inflated) because the interests of TMC came first.  Campus also points to evidence that the city manager Saba (rather than Campus) actually performed most of the "prep work" for presenting the properties to the TMC board and that Saba actually "pitched" them for purchase.  Campus also relies on the fact that he abstained from voting on these properties when they came up for vote at the TMC board meetings, and moreover, that appraisals for these properties reveal that TMC obtained them at or below market value.

The court finds that there are genuine issue of fact which preclude summary judgment on

TMC's claim of breach of fiduciary duty, including whether Campus breached his fiduciary duty in his private and undisclosed dealings with TMC, and if so whether this breached resulted in any damage to TMC.

### 2) TMC's claim of Fraudulent Concealment/Suppression

TMC also asserts that Campus fraudulently suppressed/concealed his adverse interests in properties presented to TMC for purchase and that they are due summary judgment on this claim. TMC points to Campus' undisputed failure to inform the TMC Board of his adverse interests (receipt of $1.6 million as material omissions), and Campus' advocation and recommendation to TMC of properties to purchase (from which he ultimately profited from the sale), as establishing that he intended to fraudulently induce TMC into these purchases.

To prevail on a fraudulent concealment claim under Florida law, TMC must establish: 1) a misrepresentation of material fact or suppression of the truth; 2) knowledge of the representor of the misrepresentation, or representations made by the representor without knowledge as to either the truth or falsity, or representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof; 3) an intention that the representor induce another to act on it; and 4) resulting injury to the party acting in justifiable reliance on the representation. See, e.g., Gulf Winds Federal Credit Union v. Firestone Bldg. Products Co., 2008 WL 360623, *6 (N.D. Fla. Feb. 8, 2008) (citing Jones v. General Motors Corp., 24 F. Supp. 2d 1335, 1339 (M.D. Fla. 1998)).  Fraudulent concealment by silence must be accompanied by allegations of a special relationship that gives rise to a duty to speak – such as when one party has information the other has a right to know because of a fiduciary or other relation of trust or confidence between them.  See, e.g., TransPetrol Ltd. v. Radulovic, 764 So.2d 878, 879-880 (Fla. 4th DCA 2000).

TMC asserts that Campus thus fraudulently concealed and suppressed his financial interest in these transactions despite his fiduciary duties to TMC.  Even assuming that Campus so concealed and suppressed, TMC has not presented sufficient undisputed evidence, to warrant summary judgment, that TMC would not have purchased the properties but for Campus' concealment and suppression. Florida law imposes a reliance requirement in an omissions case and requires a party asserting fraud to establish that "but for the alleged misrepresentation or nondisclosure, the party would not have entered the transaction." In re Lichtman, 388 B.R. 396, 410 (M.D. Fla. 2008) (internal citation omitted).  Moreover, the evidence of record indicates that TMC underwent a thorough decision making process when deciding to purchase properties such that TMC board members could arrive at their own conclusions about the properties -- including visual inspections as well as assessing due diligence materials, projected developed lot costs, pro formas and the like. And notably, TMC CFO Boney testified that because the TMC board members are "real estate professionals . . . we were able to evaluate whether a purchase is at an appropriate price."  For these reasons, there is a genuine issue of fact as to the materiality of Campus' alleged concealment and suppression of his interests.  Materiality of an alleged non-disclosure is a question of fact for the jury.  See, e.g., Atlantic Nat'l Bank of Fla. v. Vest, 480 So.2d 1328, 1332 (Fla. 2d DCA 1985).

TMC has also not presented sufficient undisputed evidence of damage as a result of Campus non-disclosures or omissions. TMC simply claims it was "defrauded and hoodwinked into overpaying" for the properties by Campus' improper concealment of all material facts surrounding the transactions, including the fact that he had "divided loyalties."   In contrast, Campus has presented evidence that TMC did obtain the best and lowest prices for the properties.  (Dep. Campus at 390-391).  The appraisals of record could also support Campus' position that TMC did not

overpay for the properties at issue and thus was not damaged.   Accordingly, issues of material fact remain such that TMC's motion for summary judgment on the concealment/suppression claim is **DENIED.**

### 3) TMC's claim of Negligent Misrepresentation, Negligence and Wantonness

Campus asserts that TMC cannot, as a matter of law, maintain negligence claims against him based on his purported intentional misconduct. The Court agrees. TMC has not presented evidence of any negligent conduct on the part of Campus; rather, TMC endeavors to base its negligence claims entirely on alleged intentional misconduct by Campus.  Negligence claims against Campus or Young cannot be based upon any purported intentional conduct by Campus. "[N]egligent acts are fundamentally different from intentional acts." Wal-Mart Stores, Inc. v. McDonald, 676 So.2d 12, 20 (Fla. 1st DCA 1996). Negligence does not include intentional torts like fraud.  See, e.g., State Farm Fire and Cas. Co. v. Higgins, 788 So.2d 992, 1004 (Fla 4th DCA 2001); Curd v. Mosaic Fertilizer, LLC, 993 So.2d 1078, 1082, n.3 (Fla. 2d DCA 2008).

Moreover, TMC has not even addressed the negligent misrepresentation and negligence claims, except to assert (through redirection to the conspiracy claim)  that it "was unable to find any binding Eleventh Circuit or Florida state court decision addressing the specific issue of whether a plaintiff may base a claim of civil conspiracy on wrongful conduct that does not constitute an intentional tort[;]" and to note that some courts have concluded that allegations of civil conspiracy appear inherently inconsistent with the allegations of an underlying act of negligence.  (Doc. 250 at 4-5).  This brief argument, which fails to cite any evidence in support of the negligence claims, is insufficient to withstand summary judgment on the claims of negligence.  As such, Campus' motion for summary judgment as to TMC's negligent misrepresentation and negligence claims

(including conspiracy to commit negligence[13]) (Counts Two and Five (and to the extent Count Seven is based on same)) is **GRANTED.**

### 4) TMC's claims against Young

As an initial matter, TMC's claims against Young for conversion (Count Eight), misappropriation of trade secrets (Count Eleven) and unjust enrichment (Count Thirteen) have been dismissed.  (Docs. 75, 165, 259).  As such, TMC's only remaining claims against Young are for intentional fraud (Count One), negligent/mistaken fraud (Count Two), common law civil conspiracy (Count Seven) and disgorgement (Count Twelve).[14]  For the reasons stated *supra* Young's motion for summary judgment as to TMC's claim of negligence (Count Two) is **GRANTED**.

TMC's claim in the complaint against Young is that he conspired with Campus to commit fraud.  The allegation of fraud is premised on acts or omissions of Campus, as alleged in Counts One and Three.  Notably, TMC has not alleged any misrepresentation or suppression by Young in the Second Amended Complaint.  Thus, Young is **GRANTED** summary judgment as to any substantive claim of fraud (Count Two).  To the extent that TMC attempts to claim misrepresentations or concealment by Young related to the HUD-1 Statement, such substantive claims are not alleged in the complaint and will not be addressed. Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1314-1315 (11th Cir. 2004): ". . . . [i]n Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S.Ct.

---

[13] TMC contends – citing an Iowa case – that "contrary to those merely persuasive decisions holding that an agreement to be negligent is a non sequitur, it appears that a claim of civil conspiracy can be based on negligent and/or intentional conduct under Florida law."  (Doc. 250 at 8).  The Court cannot agree.  As stated in Sonnenreich v. Philip Morris Inc., 929 F. Supp. 416, 419-420 (S.D. Fla. 1996), given the requirement of specific intent, parties cannot engage in a civil conspiracy to be negligent: "[l]ogic and case law dictate that a conspiracy to commit negligence is a non sequitur."

[14] TMC also claims that Count Three (fraudulent suppression) is also against Young (Doc. 252 at 14), however, the Second Amended Complaint names only Campus and Matthews in this count.  (Doc. 79 at 17-18).

992, 152 L.Ed.2d 1 (2002) the Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a). This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage. Indeed, the "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Id. Accordingly, the only tort claim which remains against Young is civil conspiracy.

   **5) TMC's claim of Civil Conspiracy**

   TMC has also moved for summary judgment on its civil conspiracy claim wherein they claim that Campus and Young conspired to commit breach of duty and fraud against TMC. "Where a third party [] deals with another's agent [] with knowledge that the agent is acting in violation of his fiduciary obligation to his principal [] the third party may be held jointly liable with the agent for secret profits." Martin Co. v. Commercial Chemists, Inc., 213 So.2d 477, 480 (Fla. App. 1968) (citations omitted). See also Phillips Chemical Co. v. Morgan, 440 So.2d 1292 (Fla. 3d DCA 1983). Of course in order to conspire there must be at least two parties acting with knowledge and in agreement for the same purpose. As previously discussed, issues of material fact remain regarding whether Young breached his fiduciary duties or committed fraud. In addition, as to Young, issues of material fact remain concerning whether Young had knowledge of Campus' alleged breach of fiduciary duty and alleged fraudulent concealment.[15] Accordingly, all parties' motion for summary

---

[15] The Court has considered Young's claim that TMC is estopped from bringing any of the stated claims against Young and Campus because TMC was aware that Campus and Young were involved in other real estate transactions. Specifically, Young asserts that he relied on the previous transactions as evidence that TMC allowed Campus to deal with TMC as an individual investor. While this may be relevant evidence in defense of TMC's claims against Young, it does not establish a basis for estoppel. Unlike the allegations in this case, in a prior transaction TMC was aware of Campus' involvement and chose to do business with Campus. Accordingly, the court finds the estoppel argument to be without merit.

judgment is **DENIED** as to civil conspiracy.

**6) TMC's claim of Disgorgement**

TMC claims disgorgement (Count 12), asserting that Defendants while engaged in wrongful conduct "have received payment and assets of The Mitchell Company. It would be unjust to allow the Defendants to retain these assets while they caused damage to the Plaintiff."

Disgorgement is an equitable remedy whereby a wrongdoer is forced to give up the benefits obtained as a result of his wrongdoing. See, e.g., S.E.C. v. Huffman, 996 F.2d 800, 802 (5th Cir. 1993) (providing that "[d]isgorgement wrests ill-gotten gains from the hands of a wrongdoer[]"). The remedy may not be used punitively, and thus a causal connection must exist between the breach and the benefit sought to be disgorged.  S.E.C. v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978) (stating that "[d]isgorgement is remedial and not punitive. The court's power to order disgorgement extends only to the amount [] by which the defendant profited from his wrongdoing[]"). See also Florida Discount Properties, Inc. v. Windermere Condominium, Inc., 786 So.2d 1271, 1273 (Fla. 4th DCA 2001) (finding that disgorgement for usurping the corporate opportunity was available against former directors who used positions to make advantageous purchase of property).

As to TMC's claim for disgorgement, TMC cannot seek disgorgement of Campus' interests in Model Homes, LLC and Hexagon Investments, LLC because Campus' alleged wrongdoing is not causally connected to his interest in the LLCs, nor is there any evidence that his interest in the LLCs was purchased from profits derived from the land transactions that form the basis of the allegations in this case.  To the extent that TMC seeks disgorgement as to Campus' interests in those LLCs, Campus' motion for partial summary judgment is **GRANTED**.  However, to the extent that TMC seeks disgorgement with regard to other interests or monies of Campus, TMC's entitlement to

disgorgement would be dependent upon the jury's determination of the claims against Campus. Accordingly, Campus motion for summary judgment is **DENIED.**

### 7)  Campus' Counterclaim for Breach of Contract

Campus contends that TMC breached its contractual duty to pay him 5% of the pre-tax net profit of the Single-Family Home Division of TMC for 2006 (his 2006 bonus).  (Doc. 106).  TMC asserts that it has no such duty because Campus committed the first material breach of contract by violating his fiduciary duties of loyalty, honesty and candor/full disclosure to TMC  – *i.e.*, any breach by TMC (non-payment of the 2006 bonus) should be excused by Campus initial breaches, unless and until Campus "returns his ill-gotten gains to TMC."  (Doc. 236 at 49).  TMC adds that Campus' actions (taking positions that were "adverse" to TMC) also constitute repudiation of his contract with TMC, further supporting TMC's entitlement to be excused from its contractual obligations.  As explained *supra*, genuine issues of material fact remain as to whether Campus committed fraud or breached his fiduciary duty.  These issues of fact likewise preclude summary judgment on Campus' breach of contract counterclaim because this counterclaim is tied to TMC's repudiation argument based on the allegedly "adverse" or "antagonistic" interests of Campus and his actions related to same.  Accordingly, TMC's motion for partial summary judgment on Campus' breach of contract counterclaim is **DENIED.**

### 8)  Campus' counterclaim for Fraud in the Inducement

Campus asserts a counterclaim for fraudulent inducement against TMC, alleging that TMC failed to pay him his 2006 bonus; "[a]t no time during 2006 did The Mitchell Company intend to pay bonuses to Campus[;]" and during 2006, TMC "intentionally concealed and failed to disclose to Campus that it did not intend to pay Campus his 2006 bonuses . . . in order to induce him to

continue to head its Single Family Home Division and to perform work on behalf of" TMC.  (Doc. 106 at 68-69).

To state a claim for fraud in the inducement in Florida, a party must allege that: 1) the representor made a misrepresentation of a material fact; 2) the representor knew or should have known of the falsity of the statement; 3) the representor intended that the representation would induce another to rely and act on it; and 4) the plaintiff suffered injury in justifiable reliance on the representation. See, e.g., Witt v. La Gorce Country Club, Inc., 2009 WL 1606437, *5 (Fla. 3d DCA Jun. 10, 2009) (unpublished).  In Palmer v. Santa Fe Healthcare Systems, Inc., 582 So.2d 1234, 1236 (Fla. 1st DCA 1991), the court stated, "[a] promise as to future conduct may serve as a predicate for a claim of fraud if it is made without any intention of performing, or with a positive intention not to perform."  See also Argonaut Development Group, Inc. v. SWH Funding Corp., 150 F. Supp. 2d 1357, 1364 (S.D. Fla. 2001). Campus has failed to present any evidence that at the time TMC represented that Campus was eligible for a bonus each year, TMC did not intend to pay him his 2006 bonus. In other words, Campus has shown no evidence to support this counterclaim.  Accordingly, TMC's motion for summary judgment on Campus' fraud in the inducement counterclaim is **GRANTED.**

### 9) Campus' counterclaim for Wrongful Intrusion or Invasion of Privacy

Campus' counterclaim for wrongful intrusion or invasion of privacy is based on TMC's allegedly improper conduct in viewing, retaining, copying, utilizing and distributing his personal and private documents without his authorization, permission, consent or knowledge.  In Florida, an actionable invasion of privacy claim is defined as the unwarranted exploitation or appropriation of one's personality, the publicizing of one's private affairs with which the public had no legitimate

concern, or the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. State Farm Fire & Cas. Co. v. Compupay, Inc., 654 So.2d 944, 948 (Fla 3d DCA 1995).  Florida law also provides individuals with a right of privacy in their financial records. See, e.g., New Hampshire Indem. Co., Inc. v. Reid, 2007 WL 2972618, *6 (M.D. Fla. Jul. 27, 2007).

The undisputed evidence reveals that Campus' personal and financial records were intermingled *by Campus* with TMC business records in the office that TMC provided Campus, as an employee of TMC.  This Court, in the course of resolving discovery disputes, has previously noted that those records were personal and private in nature and that TMC must return the records. However this Court likewise noted that TMC still had a right to search Campus' office upon his termination and initially view his personal and professional documents which were on TMC's property.  (Doc. 144 at 3).  In sum, Campus' intermingling of his personal and business records lifts any possible veil of privacy that may have applied.  Additionally, to the extent any of these documents or files were obtained or viewed on Campus' company computer or email sent from said computer, Campus executed an Internet E-Mail System Policy which provided that the computers and e-mail are TMC's property and "may be accessed by management at any time. You should have no expectation of privacy in the use of any of these systems, even if special access restrictions or passwords are utilized."

Even if a claim for invasion of privacy existed despite the intermingling of records, Campus has certainly not produced any evidence that mental suffering, shame, or humiliation to a person of ordinary sensibilities resulted from TMC viewing his private records. Accordingly, TMC's motion for partial summary judgment on Campus' wrongful intrusion/invasion of privacy counterclaim is

**GRANTED** and Campus' motion for partial summary judgment on this claim is **DENIED.**

**10) <u>Campus' counterclaim for Slander</u>**

Under Florida law, slander is a spoken or oral defamation of another which is published to others and which tends to damage that person's reputation, ability to conduct that person's business or profession, and which holds that person up to disgrace and humiliation. <u>See</u>, <u>e.g.</u>, <u>Hidalgo Corp. v. J. Kugel Designs, Inc</u>., 509 F. Supp. 2d 1247, 1265 (S.D. Fla. 2007): <u>Scott v. Busch</u>, 907 So.2d 662, 666 and n. 17 (Fla. 5th DCA Jul. 29, 2005). To recover for slander a plaintiff must demonstrate that: 1) the defendant published a false statement, 2) about the plaintiff, 3) to a third-party, and 4) the plaintiff suffered damages as a result of the publication. <u>Id</u>. Notably, "[s]poken words falsely imputing a criminal offense to another [i.e. 'thief' and a crook,] are actionable per se." <u>Bobenhausen v. Cassat Ave. Mobile Homes, Inc</u>., 344 So.2d 279, 281 (Fla. App. 1977); <u>Spears v. Albertson's, Inc</u>., 848 So.2d 1176, 1179 (Fla. 1st DCA 2003).

TMC contends that Campus' slander counterclaim lacks merit because he cannot prove that TMC published false statements about him. However, the evidence submitted by Campus contradicts this claim.

Campus has submitted evidence revealing that TMC's counsel was quoted in both an April 11, 2007 Pensacola News Journal article and an April 22, 2007 Mobile Press Register article as stating that Campus had "illegal projects" and that "[h]is countersuit against us is like a little boy getting caught with his hand in the cookie jar[]" -- "[h]e's trying to divert attention to something else[,]" and "[w]e don't feel like we owe him any money. If we do, it will be deducted against the many millions he's stolen from us." (Doc. 254-2 at 5-8). Additionally, according to an Affidavit submitted by TMC's former Senior Vice-President and Pensacola City Manager Michael Paul Saba,

TMC's President Saint stated that Campus was terminated because he stole from TMC: "[s]hortly after Joe Campus was terminated, TMC's President, John Saint, stated in my presence and in the presence of at least one other TMC employee that Campus had been terminated because he stole from TMC."  (Doc. 354-3 at 4 (Aff. Saba at ¶12)).

Campus's slander claim is rooted (in part) on the statements made about him by TMC's attorney to two newspapers, which were then published.   As noted in Lipsig v. Ramlawi, 760 So.2d 170 (Fla. 3d DCA 2000):

> Florida law also uniformly holds that, in the absence of evidence to the contrary, an attorney in Florida has the actual and apparent authority to speak and to act for his client only in those matters necessary or incidental to the accomplishment of the purpose of the lawyer's retention. See, e.g., State ex rel. Personal Finance Co. v. Lewis, 140 Fla. 86, 191 So. 295, 296 (1939) (reasoning that "... in matters of procedure or practice which affect solely the conduct of a cause, an attorney may bind his client ... [.]"); Johnson v. Estate of Fraedrich, 472 So.2d 1266, 1268 (Fla. 1st DCA 1985) (holding that "an attorney is generally viewed as the agent of his client. An act done by an agent on behalf of the principal within the scope of the agency is not the act of the agent but of the person by whose direction it is done[]")  (citations omitted); Mendelsund v. Southern-Aire Coats of Fla., Inc., 210 So.2d 229, 231 (Fla. 3d DCA 1968) (holding that "there is a presumption that an attorney, as an officer of the court, is duly authorized to act for a client whom he professes to represent."); Epperson v. Rupp, 157 So.2d 537, 538 (Fla. 3d DCA 1963) (reasoning that "an attorney is an agent for his client" and accordingly, for example in probate proceedings, the attorney can "sign an 'objection' to a claim, the same as he may institute a suit for a client without the client's signature or file a claim in an estate without the client's signature.").

Here, a review of the newspaper statements supports the finding that TMC's attorney was making statements on behalf of, or for, TMC (thus in his capacity as TMC's counsel and authorized representative).  For example, TMC's counsel stated that Campus "countersuit **against us**" is like a little boy getting caught with his hand in the cookie jar, and "[**o]ur** position" is that "**we** don't feel like **we** owe him any money. . . . he's stolen from **us**." (Doc. 254-2 at 4, 8 (emphasis added)).  There is no indication in the record that TMC's counsel was not speaking for and/or acting on behalf of

TMC as part of his retention, or that he was not duly authorized to do so by TMC.  Additionally, TMC has not contended as such in response to Campus' claims.

Moreover, TMC has wholly failed to rebut this evidence, except to assert simply that "TMC has shown good motive for the statement, since Campus already had admitted to receiving $1.6 million in undisclosed payments from Young[.]" (Doc. 263 at 16).  Under Florida law anytime truth "is only a defense to defamation when the truth has been coupled with good motive[,]" Lipsig v. Ramlawi, 760 So.2d 170, 183 (Fla. 3d DCA 2000).  Here, however, the "truth" of these statements has not been established.  Accordingly, because disputed issues of material fact remain, TMC's motion for summary judgment as to Campus' counterclaim for slander is **DENIED.**

### III.   Conclusion[16]

Based upon the foregoing, the Court finds and it is hereby **ORDERED** that:

- Campus' motion for partial summary judgment as to TMC's claims against him for conversion and unjust enrichment is **MOOT;**
- Campus' motion for partial summary judgment as to TMC's claims against him for wantonness, negligent misrepresentation and negligence (including conspiracy to commit negligence) is **GRANTED;**
- Campus' motion for partial summary judgment as to his counterclaim for wrongful intrusion/invasion of privacy is **DENIED;**
- Campus' motion for partial summary judgment is **GRANTED** in part with regard to TMC's disgorgement claim against him based upon his interests in Model Homes, LLC and Hexagon Investments, LLC; however, to the extent that TMC seeks disgorgement with regard to other interests or monies of Campus, his motion is **DENIED;**

**and**

- TMC's motion for partial summary judgment as to its claims against Campus for fraudulent concealment, fraudulent suppression, breach of fiduciary duty and civil conspiracy, is **DENIED;**
- TMC's motion for partial summary judgment as to Campus' counterclaims for false light invasion of privacy, wrongful intrusion/invasion of privacy and

---

[16]  On a final note, TMC moves for Rule 54(b) certification. However, because genuine issues of material fact remain on the claims noted herein, the court finds that such certification is not appropriate.

fraudulent inducement is **GRANTED;**

- TMC's motion for partial summary judgment as to Campus' counterclaims for breach of contract and slander is **DENIED**;

**and**

- Young's motion for summary judgment on TMC's claims against him for fraudulent concealment, negligent/mistaken fraud (and to the extent a conspiracy is based on any negligent/mistaken fraud) is **GRANTED**;
- Young's motion for summary judgment as to the conspiracy claims against him is **DENIED;**
- TMC's claims against Young for conversion, misappropriation of trade secrets and unjust enrichment have been dismissed and so Young's motion for summary judgment as to these claims is **MOOT.**

**DONE** and **ORDERED** this the **5th** day of **November 2009.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**